FLOYD J. SKINNER *et al.*, Plaintiffs-Appellees and Appellants, *v.* GEORGE P. BAKER *et al.*, Defendants-Appellees.—(THE BALTIMORE AND OHIO RAILROAD COMPANY, Defendant-Appellant.)

First District (2nd Division)    No. 77-3

Opinion filed December 29, 1978.

774

Robert E. Harrington and John J. Naughton, both of Chicago (Harrington & Harrington, Ltd., and Henslee, Monek & Henslee, of counsel), for appellants Floyd J. Skinner *et al.*

James R. Gannon, Damien T. Wren, and Lewis, Overbeck & Furman, all of Chicago (Ronald J. Hoenig and Douglas A. Lindsay, of counsel), for appellant Baltimore & Ohio Railroad Company.

Wildman, Harrold, Allen & Dixon, of Chicago (Max E. Wildman, Mark C. Fedota, and Kay L. Schichtel, of counsel), for appellees George P. Baker, Richard C. Bond, and Jervis Langdon, Jr.

Mr. JUSTICE BROWN[1] delivered the opinion of the court:

This appeal arises from an action brought by plaintiffs, Floyd J. Skinner and John E. Guttery, to recover for severe and permanent injuries sustained by Skinner and Guttery when they were struck from behind by a train owned and being operated by defendant, the Baltimore and Ohio Railroad Company (hereinafter "B&O"). Plaintiff's complaint alleged that their injuries were caused by the negligent or wilful and wanton misconduct of B&O.

In a separate action, Skinner and Guttery sued Penn Central Transportation Company (hereinafter "Penn Central"), their employer at the time of the incident, alleging a cause of action under the Federal Employers' Liability Act (hereinafter "F.E.L.A."). The cases were consolidated prior to trial, and were tried under the substantive law of Ohio, where the injuries occurred.

Upon a jury trial, verdicts in favor of plaintiffs and against B&O were returned on the issues of negligence and wilful and wanton conduct. Judgment was entered on the verdicts and B&O appeals. The issues under the F.E.L.A. were found against plaintiffs and in favor of Penn Central, and plaintiffs appeal from this verdict.

The issues before this court are: (1) whether B&O was not guilty, as a matter of law, of wilful and wanton misconduct; (2) whether B&O was not guilty, as a matter of law, of negligence; (3) whether plaintiffs were guilty of contributory negligence as a matter of law; (4) whether the jury was properly instructed as to the legal elements, under Ohio law, of wilful and wanton misconduct; (5) whether the court erred by refusing a circumstantial evidence instruction; (6) whether the court erred by refusing to give an instruction defining the term "trespasser"; (7) whether the court erred by refusing an instruction on the defense of assumption of the risk; (8) whether certain instructions were peremptory; (9) whether the court erred by refusing to give certain special interrogatories; (10) whether plaintiffs' final arguments were improper and inflammatory, and deprived B&O of a fair trial; (11) whether the court erred by submitting

---

[1] This opinion was prepared by Justice Brown while assigned to the Illinois Appellate Court, First District.

new verdict forms to the jury after they had returned one set of forms, and by mandating the jury to return verdicts utilizing the new forms.

A review of the evidence reveals that on the night of July 24-25, 1972, Floyd J. Skinner and John E. Guttery, employees of the Penn Central, were working on the south side of the Penn Central railroad yard near Milepost 16 in Zanesville, Ohio. The train yard in Zanesville ran east-west and was divided into the Penn Central railroad yard, used to designate the Penn Central tracks on the north side of the Zanesville yard, and the B&O railroad yard, used to designate the B&O tracks on the south side of the Zanesville yard. At the point where the injury occurred there were four primary tracks running parallel to each other. From the north they were referred to as the Penn Central siding, the Penn Central main, the B&O siding and the B&O main. The distance between the Penn Central main track and the B&O siding track was minimal. Guttery testified that the distance between the ties of these two tracks was only about two feet, and that if there were cars on both tracks, one could not work between them and it would be necessary to turn sideways to get enough clearance. To the east of this area, there were additional transfer tracks leading off the Penn Central siding which were used in switching cars to make up new trains. There were no artificial lights in the area where the accident occurred, and the only source of illumination available were the lanterns the trainmen generally carried with them.

On the night of the injury, both B&O and Penn Central had crews of railroad men working in the Zanesville yard. The Penn Central crew consisted of five men: the engineer Jacobs; the fireman Phillips; the head brakeman Beaver; the flagman Floyd Skinner; and the conductor John Guttery. All five men testified at trial. The B&O crew consisted of the engineer Laughery, the fireman Ellison, the head brakeman Tipton; the second brakeman Keffer; and the conductor Colling. Only Keffer and Colling testified at trial.

Plaintiffs had reported to work at 10:30 p.m., and had proceeded to the Penn Central transfer tracks and performed some work in that area. While working at that location, they had had a discussion with certain members of the B&O crew. After completing their work at the transfer tracks, the Penn Central crew proceeded westward to the area around Milepost 16, where the accident was to occur. Guttery had a switch list which listed the numbers of certain cars located on the Penn Central siding which were to be uncoupled and sent to the shop for repairs. The Penn Central crew had performed some of the switching in that area before the plaintiffs were struck.

In performing their work, Skinner and Guttery both used a radio to communicate with the engineer and fireman who were located on the

yard engine. Beaver, the head brakeman, did not have a radio, but did have a lantern. Both Skinner and Guttery had lanterns and were using the lanterns to read the numbers of the railroad cars on the Penn Central siding.

The B&O crew was also involved in switching activities that night. As has been the practice of the B&O yard crew in the past, new trains would be made up by using the B&O side track adjacent and parallel to the Penn Central main track in the vicinity of Milepost 16.

Shortly before the accident occurred, the B&O yard crew rode their yard engine east on the B&O main track, past Milepost 16, to a location called the B.Z. siding. There, the B&O yard crew picked up 29 hopper cars and one gondola car. The crew intended to place these hopper cars, minus the gondola, on the B&O side track to become part of a new train. Each car was 40 feet long and 10 feet, 8 inches in width, thereby extending a little less than 3 feet out from each rail. The cars were loaded with manganese and weighed approximately 95 tons. Keffer, the B&O brakeman, testified that loaded cars tended to rattle less and to make less noise than unloaded cars.

The B&O engine pulled these cars back west on the B&O main track past Milepost 16 until the east (the gondola) car was approximately 50-feet east of the east crossover to the B&O side track. Keffer uncoupled the gondola car and left it on the B&O main track. After uncoupling the gondola car, Keffer had the B&O cut of cars continue west in order to clear the east crossover. After the switches were aligned for the eastward crossover movement onto the B&O side track, the B&O yard engine pushed the hoppers eastward onto the B&O side track, and towards the plaintiffs.

At this time, Keffer, the B&O brakeman who was at the east crossover, observed the plaintiffs' lanterns on the north side of the Penn Central yard, about 800 feet east of him. Therefore, Keffer waited while the loaded cars were shoved past him and then boarded the engine from the north side. Conductor Colling testified that he did not see the plaintiffs or Brakeman Keffer during the movement. He was on the engine at that time and did not look because the engineer was looking. However, Colling admitted that he was aware the Penn Central men were working in that area, as were all of the B&O crew, because of their previous trips on the B&O main. Furthermore, Colling had talked to Skinner earlier that evening when the Penn Central crew was working on the transfer tracks west of the B&O siding.

Rule 103—A of the B&O operating manual which was admitted into evidence states as follows:

> "When shoving tracks or when doubling over, or placing cars on a track, unless it is known the track will accommodate the

movement without fouling other tracks, or without shoving over end of track, a man must be stationed on the leading car or at the rear of such track in position to be clearly seen and to give signals, unless the movement is otherwise protected.

When shoving tracks and conditions require, it must be known that all couplings are made or that sufficient, hand brakes are applied on cars at other end of track to prevent from rolling out to foul.

It must always be known there is sufficient room on opposite end of tracks to allow for slack action of cars."

The following colloquy took place while Keffer was on the stand in regard to this rule:

"Mr. Harrington: Q. Was there anyone riding on the lead car of your 28 car cut?

A. No.

Q. Was there a light on the lead car?

A. No.

Q. Are you required to ride a car when you're shoving it in this instance?

A. I believe the rule says under necessary conditions.

Q. Do you know what rule that is?

A. Rule 103.

Q. Had you on previous occasions rode a car in a cut as you're shoving it?

A. Yes, if there were cars too close that we figured they would tie into, or if there was a B&O train on the main track picking up, sometimes they picked up out of the Brown siding and they would be in that area, and we would ride up there to warn them either to ride them or put a C.Z. onto the car.

Q. And in this instance, you did not feel that you were required by Rule 103 to ride this car, is that correct?

A. That has been common practice. We seen that done hundreds of times around there.

Q. By the B&O?

A. Yes. I have been there since 1949, and we would say that the riding had been only occasional.

Q. Why would you only do it occasionally? What is the difference between one occasion and another?

A. Just special occasions that there would be, there would be cars that we thought we might tie into or there would be a crew working along there, along the B&O side.

Q. And yet you saw these men down east of you and you shoved these cars down in that direction, is that correct?

A. That's right.

Q. If that was a clear track, would you shove it down?

A. We always shoved it down.

Q. With a rider, I'm referring to.

A. No.

Q. If there were cars in there, would you shove it down with a rider?

A. If we thought there was a possibility of tying into.

Q. Why would you do it then?

A. To avoid damage.

Q. To what?

A. I suppose the equipment

Q. To the cars, right?

A. Yes.

\* \* \*

Mr. Gannon: Q. Now under the circumstances of that particular move, I understand your testimony that there was no need, as far as you're concerned, under B&O rules, to put any man on the front or any fuse or anything like that?

A. Whether it was need or not, it was past practice not to do it.

Q. I understand from your testimony that if this siding would have had some cars in here, that you might have run into when you pushed in under those circumstances, you would have to have a man ride the front to stop it before you would couple on, is that right?

A. We did whenever we were doubtful about whether there was going to be room enough to put the cars in, always there would be someone to ride up there to see whether it would hold them or not.

Q. But that particular night you had room for 60 or 70 cars?

A. Right.

Q. So, you said, if the B&O crew was working in this area you would have one—someone ride down and put a fuse on?

A. It was little difference there. It really amounted to the same thing. What would happen if they had a B&O crew working there, they would be working between two cars.

Q. On the B&O property there?

A. Yes, sir.

Q. Under those circumstances you might expect them to be near the siding?

A. Yes, sir.

Q. And you would put somebody on to warn them, isn't that correct?

A. We usually rode up around there when we had a man up there."

Despite the knowledge that the Penn Central crew was working in the dark in the area where the B&O train was headed, no rider or light was placed on the lead car of the B&O train.

According to the testimony, Guttery and Skinner were located somewhere between the empty Penn Central main track and the B&O side track when they were hit by the lead car of the B&O cut of cars. They moved to this position because it was easier to read the identification numbers of the Penn Central cars being pulled from east to west on the Penn Central side track.

Neither plaintiff heard the B&O cars approaching before being struck nor did they suspect that the B&O side track would be used that night. At the time he was hit, Guttery was looking at the oncoming cars on the Penn Central track, and was facing northeast. The B&O lead car hit him on the left shoulder and back. He yelled a warning to Skinner, some 20-30 feet east of him. A moment or two later, Skinner, facing east, was also hit on the back by the lead car.

The B&O cars stopped with the lead car some 18 car lengths east of the accident scene. After they stopped, Guttery climbed in between two of the cars, moved east, and located Skinner. Skinner was found on the south side of the B&O cut of cars, between the B&O side track and the B&O main track.

At the conclusion of the plaintiffs' case, and again at the end of the entire case, B&O submitted motions to direct verdicts on the issues of B&O's alleged wilful and wanton misconduct. The trial court denied these motions. As part of its post-trial motions, B&O moved the trial court to enter judgments *n.o.v.* on these same issues, which the court also denied. B&O contends the trial court's actions on these issues were in error since the evidence, when viewed in an aspect most favorable to plaintiffs, so overwhelmingly favors B&O that verdicts finding B&O liable to plaintiffs for wilful and wanton misconduct cannot stand.

■■ Under Ohio law, wilful and wanton conduct is a question to be determined by the facts of each case. While an actual intent to injure a particular person need not be shown (*Tighe v. Diamond* (1948), 149 Ohio St. 520, 80 N.E.2d 122), the concept of wilful and wanton misconduct necessarily includes actual or constructive knowledge of surrounding circumstances and existing conditions. *Bailey v. Brown* (1973), 34 Ohio St. 2d 62, 295 N.E.2d 672; *Brooks v. Norfolk & Western Ry. Co.* (1976), 45 Ohio St. 2d 34, 340 N.E.2d 392.

In the recent case of *Hawkins v. Ivy* (1977), 50 Ohio St. 2d 114, 363 N.E.2d 367, the Ohio Supreme Court further elaborated on the concept of

wanton misconduct. The case concerned a motorist whose car stalled on a dark and rainy night on the inside or "passing" lane of a divided four-lane highway, approximately 15 to 25 feet from a driveway to a shopping center. Being unable to start his vehicle, the motorist departed for a gasoline station. No effort was made to move the disabled vehicle from the passing lane into the nearby driveway, nor were the flasher warning lights activated. Furthermore, neither the parking lights nor headlights were turned on. Approximately 10 minutes later, another motorist collided with the rear of the stalled vehicle and was injured. The Supreme Court of Ohio stated that "[w]here the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct." *Hawkins,* 50 Ohio St. 114, 117-18.

■■ The evidence in the instant case, when viewed in a light most favorable to plaintiffs, shows clearly that the B&O crew had actual knowledge the plaintiffs were working in the dark near the B&O siding before they made the move which resulted in the plaintiffs' injuries. Earlier in the evening, some of the B&O crew had talked to the plaintiffs. Keffer, the B&O brakeman, testified that immediately before the accident, he saw three lanterns just north of the area the B&O cars were heading, although he could not tell exactly where the Penn Central crew members were. Colling, the B&O conductor, testified that he did not see the plaintiffs or Keffer during the movement eastward, but that he was aware the Penn Central men were working in that area because of the previous trips on the B&O main. Colling also testified that in the past, he had occasionally seen Penn Central men on the B&O tracks in the area where the accident occurred, but that it was not an everyday occurrence.

■■ ■ It was reasonable for the jury to decide that the B&O train crew failed to exercise any care whatsoever under circumstances in which there was great probability that harm would result from the knowledge the crew had of surrounding circumstances and existing conditions. The decision of the jury was not against the manifest weight of the evidence, and the trial court was correct in refusing to direct verdicts at the close of the plaintiffs' case and at the close of all the evidence. Likewise, its refusal to enter judgments *n.o.v.* at the request of the B&O railroad was correct.

Defendant next argues that the evidence clearly establishes plaintiffs to be guilty of contributory negligence as a matter of law. Defendant argues that plaintiffs, despite having actual knowledge of the great danger inherent in allowing themselves to be on or afoul of the B&O side track, proceeded to move on or afoul of that track and failed to take any precautions for their own safety

■■ However, in view of our resolution of the wilful and wanton conduct

issue, this issue need not be discussed as contributory negligence is not a defense to wilful and wanton misconduct. *Kellerman v. J. S. Durig Co.* (1964), 176 Ohio St. 320, 199 N.E.2d 562.

Defendant next contends that the trial court erred by instructing the jury with instructions which failed to set forth the legal elements, under Ohio law, of either wilful or wanton misconduct. Plaintiffs submitted Illinois Pattern Jury Instructions, Civil, No. 14.01 (2d ed. 1971) (here-inafter IPI) and B&O objected to this instruction on the grounds that it did not set forth the Ohio legal criteria for determining either wilful or wanton misconduct. The trial court, over objection, accepted and ultimately gave this plaintiffs' instruction to the jury. In its post-trial motions, B&O again raised this issue. IPI Civil No. 14.01 is as follows:

"When I use the expression 'wilful and wanton misconduct' I mean a course of action which shows an utter indifference to or conscious disregard for the safety of others."

The elements of wilful and wanton misconduct have been summarized by the Ohio Judicial Conference at 1 Ohio Jury Instructions 7.90(b)(c) in the form of a recommended jury instruction:

"7.90 Wilful or wanton misconduct

b. WILFUL MISCONDUCT. Wilful misconduct is intentionally doing that which is wrong or intentionally failing to do that which should be done. The circumstances must also disclose that the defendant knew or should have known that such conduct would probably cause injury to the plaintiff. It is a general rule that every person is presumed to intend the natural and probable consequences of his acts. Wilful misconduct implies an intentional disregard of a clear duty or of a definite rule of conduct; a purpose not to discharge such duty, or to perform wrongful acts with knowledge of the likelihood of resulting injury. Knowledge of surrounding circumstances and existing conditions is essential; however, actual illwill or an intent to injure need not be present.

c. WANTON MISCONDUCT. Wanton misconduct is such behavior as manifests a disposition to perversity. It must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious from his knowledge of such circumstances and conditions, that his conduct will probably result in injury. Wanton misconduct implies a failure to use any care for the plaintiff and an indifference to the consequences, when the probability that harm would result from such failure is great, and such probability is known, or ought to have been known, to the defendant."

■■ It should be noted that while these instructions are not mandatorily required in Ohio, they are consistent with Ohio case law. It is clear from

the foregoing that the IPI instruction tendered did not fully define the Ohio law of wilful and wanton misconduct in that it did not specifically include the element of actual knowledge of surrounding circumstances and existing conditions. Nevertheless, we do not believe reversible error occurred by the use of this instruction, as it is clear from the evidence that defendant B&O possessed actual knowledge of the circumstances.

■■ Furthermore, defendant cannot be heard to object when it failed to tender a proper instruction defining wilful and wanton misconduct. The instruction tendered by defendant stated as follows:

> "When I use the expression 'wilful and wanton conduct,' I mean it must be such conduct with knowledge of a dangerous situation, liable to cause injury to others, as manifest a heedless disregard for or indifference to the rights of others or for the consequences. That is, such conduct as manifests a disposition to perversity."

This instruction is improper in that it fails to include as an element the intentional disregard of a clear duty or of a definite rule of conduct, and it changes "knowledge of the circumstances and conditions" to "knowledge of a dangerous situation."

The cases cited by defendant are not in point as they concern situations where jury instructions misstated the law and facts. In the present case, the instruction tendered was consistent with the law and facts, but it failed to specifically include a reference to actual knowledge of circumstances. However, this element is readily inferred.

B&O next argues that the trial court refused to give proper instructions setting forth B&O's theory of the case. A party to a lawsuit has the right to have the jury instructed upon its theory of the case when that theory is supported by the pleadings and evidence. (*Winston v. Chicago Transit Authority* (1st Dist. 1971), 2 Ill. App. 3d 151, 276 N.E.2d 65.) However, where no prejudice is shown, the refusal to give an instruction cannot be deemed reversible error. *McManus v. Feist* (4th Dist. 1966), 76 Ill. App. 2d 99, 221 N.E.2d 418.

B&O submitted the Illinois Pattern Jury Instruction on circumstantial evidence, IPI Civil No. 1.03, which read as follows:

> "A fact may be proved by circumstantial evidence. Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the facts sought to be proved."

The trial court refused the instruction. B&O maintains this was error in that there was ample circumstantial evidence in the record to show that plaintiffs were injured while in the B&O yard, and that therefore plaintiffs were trespassers (or licensees)´ at the time of the accident. In order to present this defense properly, defendant argues that it was essential for

the trial court to apprise the jury that B&O could, by the use of circumstantial evidence, prove that plaintiffs were in the B&O yard.

■■ The B&O offered no circumstantial evidence either by experts or lay witnesses. The evidence adduced in the case was direct and the defendant was permitted to argue all inferences therefrom whether remote or otherwise. The tendered instruction was correctly refused. *Kaufmann v. Firestone Tire & Rubber Co.* (1st Dist. 1972), 3 Ill. App. 3d 628, 632, 279 N.E.2d 498.

■■ B&O next argues that the court's refusal to give an instruction defining the legal term "trespasser" constituted prejudicial error. We disagree. The word has a common meaning and does not need legal definition. We also note that the following instructions were given: (1) defining the duty of an owner of land to a trespasser; (2) defining the duty of an owner of land to a licensee; and (3) the definition of a licensee. A review of these, as well as all the instructions given, indicates that the issues in the case were fairly covered.

■■ B&O's next contention is that the court's refusal to give an instruction on the defense of assumption of the risk constitutes prejudicial error. Such defense is available to the defendant where the plaintiffs consented to or acquiesced in an appreciated or known risk, even though defendant may be guilty of wilful and wanton misconduct. (*Wever v. Hicks* (1967), 11 Ohio St. 2d 230, 234, 228 N.E.2d 315.) However, an instruction on the defense of assumption of the risk is properly given only where the evidence presented supports the defense. (*Winston v. Chicago Transit Authority.*) In the instant case, the defendant failed to provide any evidence that plaintiffs appreciated or knew of the danger or that the danger was so obvious that they necessarily acquiesced or consented to the risk. (See *Ricks v. Jackson* (1959), 169 Ohio St. 254, 159 N.E.2d 225.) Therefore, the instruction was properly denied.

■■ B&O further contends that plaintiffs' instructions Nos. 18 and 19 were peremptory in character because they directed the jury to render verdicts for plaintiffs if the jury found the enumerated items in the instructions to be true. A peremptory instruction which does not include a valid affirmative defense present in the case has been held to be fatally defective. (*Mooney v. City of Chicago* (1909), 239 Ill. 414, 88 N.E. 194.) Further, a peremptory instruction which omits a material factual issue as to a party's legal status is also fatally defective. *Krantz v. Nichols* (4th Dist. 1956), 11 Ill. App. 2d 37, 135 N.E.2d 816.

■■ However, we need not consider the peremptory nature of these instructions in the case before us. None of the objections B&O now raises as to instruction No. 18 were made at the conference on instructions, and therefore B&O has waived the right to raise those objections now on

appeal. As to instruction No. 19, B&O argues that it is fatal as it failed to include, as an affirmative defense, the B&O defense of assumption of the risk. We have previously stated that there was insufficient evidence in the record to present this defense to the jury, and the doctrine was therefore properly excluded from the instruction.

B&O contends that the trial court refused to give three sets of special interrogatories tendered by B&O, which were in proper form and which were on ultimate factual issues in the case. The second set of interrogatories dealt with assumption of the risk, and the third set concerned the wilful and wanton misconduct of plaintiffs. Neither of these interrogatories related to ultimate factual issues in the case, and therefore, they were properly refused. The first set of special interrogatories concerned the negligence of plaintiffs, and when viewed in conjunction with the ultimate issues in the case, this interrogatory was properly refused as it is confusing, incomplete, imprecise and in improper form.

B&O further contends that plaintiffs' final arguments were improper and inflammatory, and deprived B&O of a fair trial. However, B&O failed to object to those arguments at trial, and failed to raise these issues in their post-trial motions and they are therefore waived. In any event, we have examined the transcript and believe the arguments were within the range of advocacy.

B&O next contends that the trial court committed prejudicial error by (1) refusing to declare a mistrial upon the return of jury verdicts finding B&O guilty of both wilful and wanton misconduct and negligence, (2) by submitting new verdict forms to the jury, (3) by mandating the jury to return verdicts with these forms and (4) by entering judgments on these verdicts. The jury initially returned the following verdicts finding B&O guilty of wilful and wanton misconduct and negligence:

"(a) We, the jury, find for the plaintiff, Floyd J. Skinner, and against the defendant, Baltimore and Ohio Railroad Company. We assess the plaintiff's damages in the sum of $500,000.00.

We further find for the defendant, Penn Central Transportation Company, and against the plaintiff, Floyd J. Skinner.

(b) We, the jury, find for the plaintiff, Floyd J. Skinner, and against the defendant, Baltimore and Ohio Railroad Company, on his charges of wilful and wanton misconduct. We assess the damages in the sum of $100,000.00.

(c) We, the jury, find for the plaintiff, John E. Guttery, and against the defendant, Baltimore and Ohio Railroad Company. We assess the plaintiff's damages in the sum of $200,000.00.

We further find for the defendant, Penn, Central Transportation

Company and against the plaintiff, John E. Guttery.

(d) We, the jury, find for the plaintiff, John E. Guttery, and against the defendant Baltimore and Ohio Railroad Company, on his charges of wilful and wanton misconduct. We assess the damages in the sum of $100,000.00."

This was improper (*Eggimann v. Wise* (2d Dist. 1963), 41 Ill. App. 2d 471, 191 N.E.2d 425; *Tighe v. Diamond* (1948), 149 Ohio St. 520, 80 N.E.2d 122; *Universal Concrete Pipe Co. v. Bassett* (1936), 130 Ohio St. 567, 200 N.E. 843) and B&O moved for a mistrial, which motion the trial court denied. The court, over the objection of B&O, then prepared two new verdict forms. These were submitted to the jury with instructions to return new verdicts. The new verdicts were returned as follows:

"(a) We, the jury, find the issues for the plaintiff, Floyd J. Skinner, and against the defendant, Baltimore and Ohio Railroad Company.

We, the jury, find the issues for the plaintiff, Floyd J. Skinner, and against the defendants, Baltimore and Ohio Railroad Company, on his claims of wilful and wanton misconduct.

We assess the plaintiff, Floyd J. Skinner's damages in the sum of $600,000.00.

We, the jury, find the issues for the defendant, Penn Central Transportation and against the plaintiff—Floyd J. Skinner.

(b) We, the jury find the issues for the plaintiff, John E. Guttery, and against the defendant, Baltimore and Ohio Railroad Company.

We, the jury, find the issues for the plaintiff, John E. Guttery and against the defendant, Baltimore and Ohio Railroad Company, on his claims of wilful and wanton misconduct. We assess the plaintiff John E. Guttery's damages in the sum of $300,000.00.

We, the jury, find the issues for the defendant, Penn Central Transportation Company, and against the plaintiff, John E. Guttery."

B&O argues that the confusion over the various verdicts demonstrates the jury's complete misunderstanding of the issues. We disagree. Judgment could not be entered under the original verdicts because it was unclear what amount was intended for each plaintiff by the jury. The jury was not originally told that each plaintiff was to receive a single amount. There were no grounds for a mistrial as the jury clearly found B&O negligent and also found its conduct to be wilful and wanton. The only way to determine what amount the jury intended to award each plaintiff was to submit new instructions.

■■ As to B&O's contention that the jury assessed "obviously punitive" damages on the issue of wilful and wanton misconduct, this is pure

speculation. The jury was not instructed on punitive damages. Actually plaintiffs withdrew their punitive damage instruction when defendant erroneously advised the court that punitive damages were not allowable under Ohio law. In selecting from among the original verdict forms, the jury was faced with two blanks for assessing the plaintiffs' damages. Rather than placing the same amount in those blanks, they placed the higher amount in the negligence verdict and the lower amount in the wilful and wanton verdict. Nowhere were they told that the verdict for each plaintiff had to be in a single amount. When they were given proper verdict forms, they combined the amounts and returned the verdicts on which judgment was entered. In all these circumstances, it is clear that no element of punitive damages was contained in their original verdicts and that the intention of the jury to award the respective sums in returning the original verdicts was confirmed by the return of the final verdicts.

Finally, B&O raises other purported errors which either individually or in combination, deprived B&O of a fair trial. These errors include the introduction of hearsay, improper cross-examination, abuse of discretion, relevancy, misrepresentations of fact by opposing counsel, erroneous instructions, and the failure of the trial court to direct a verdict. None of these have any merit.

For the reasons stated the judgment for plaintiff must be affirmed.

The second part of this appeal involves the jury's finding that defendant Penn Central was not negligent under the Federal Employers' Liability Act. Plaintiffs maintain that the verdict was contrary to the manifest weight of the evidence, and that the trial court should have granted plaintiffs' motion for a new trial. In this regard, a brief review of some of the relevant evidence would be helpful.

The evidence established that the plaintiffs were compelled to work in total darkness at a place where the distance between the B&O siding and the Penn Central main is very slight. If there had been cars on both of these tracks, it would have been impossible to work between them.

Jacobs, the Penn Central engineer, was on the south side of the engine located on the Penn Central siding, and was in constant radio communication with the plaintiffs. Jacobs testified that he was approximately 20 to 25 car lengths away from the lanterns of the ground crew when he first saw the B&O cars being shoved on the B&O siding. He never saw the cars when they were coming, but just noticed them as they were passing. Though he was approximately six feet from the radio, he did not use that radio to notify the plaintiffs that a cut of cars was being shoved down the B&O siding.

Beaver, the head brakeman, testified that while stationed at the back track switch, he saw the B&O cut going past him on the B&O siding. Beaver was also surprised to see the draft of cars, stating that the lead car

was approaching him when he first saw it even though he was only 10 to 15 feet away from that car when it went by him. Plaintiff Guttery was 8 to 12 car lengths east of him at that time, but he did not attempt to warn Guttery of the approaching cars silently running on the B&O siding.

■■ In an action brought under the F.E.L.A., a jury verdict will only be set aside if there was insufficient evidence to permit the jury to reach the conclusion it did. (*Heater v. Chesapeake & Ohio Ry. Co.* (7th Cir. 1974), 497 F.2d 1243, *cert. denied* (1974), 419 U.S. 1013, 42 L. Ed. 2d 287, 95 S. Ct. 333.) In this case, the verdict was supported by competent evidence, and there is no basis for overruling that verdict.

Plaintiffs advanced two theories of liability against Penn Central: (1) that Penn Central should have provided artificial lighting in the railroad yard; and (2) that the Penn Central crewmen who first noticed the B&O train should have warned the plaintiffs.

■■ However, the record shows that the plaintiffs were not looking in the direction of the approaching train and that their attention was being directed elsewhere. Plaintiffs also testified that they did not hear the approach of the train. It is not an unreasonable conclusion for the jury to have decided that the existence of sufficient artificial lighting would not have called the plaintiffs' attention to the approaching train.

As to the second theory, it is for the jury to decide how a reasonably careful person would act under given circumstances, and to further decide whether the failure to so act caused, in whole or in part, the plaintiffs' injuries. In this case, there was sufficient evidence to support the jury's conclusion that the Penn Central crewmen were not aware that their co-workers were in danger of being struck by the B&O cut of cars.

For the reasons stated the judgment for defendant Penn Central should be affirmed.

Judgments for appellants are affirmed. Judgment for appellee, Penn Central Transportation Company, is affirmed.

STAMOS, P. J., and PERLIN, J., concur.